UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
www.alsb.uscourts.gov

In re:                                                    Chapter 11

THOMASBORO LANDCO, LLC,                                    Case No. 22-10260-JCO

              Debtor.

_____/

## DEBTOR'S MOTION FOR FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING AND GRANT SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE

---

### STATEMENT OF RELIEF REQUESTED

The Debtor seeks authority in this Motion to borrow money, pursuant to a credit facility from the DIP Lender (as hereinafter defined), in order to fund the payoff of secured debt and development costs and other operating expenses and the costs of administration in this Chapter 11 case in accordance with the proposed budget attached to this Motion as **Exhibit C**. The liens proposed to be granted would be senior liens on all property of the Debtor. This Motion seeks to have the liens granted pursuant to any financing approved by this Court to be deemed perfected without the need for any further filings. The principal terms of the credit facility are set forth in Paragraph 19 herein.

---

THOMASBORO LANDCO, LLC, as debtor and debtor in possession (the "**Debtor**" or "**Thomasboro**"), by and through its undersigned attorneys, hereby files its *Motion for Final Order Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status* (the "**Motion**") and respectfully requests that this Court enter an order, *inter alia*:

(A)      authorizing the Debtor to borrow up to an aggregate principal amount of $26,000,000.00 on a senior-secured and superpriority basis financing (the "**DIP Facility**") from LEGALIST DIP GP, LLC (the "**DIP Lender**"), substantially in accordance with the terms of the

Summary of Key Terms and Conditions for Debtor-in-Possession Term Loan Facility, attached hereto as **Exhibit A** (the "**Term Sheet**");[1]

(B)  authorizing the Debtor to execute the Term Sheet, a definitive credit agreement consistent with the terms of the Term Sheet and in the form substantially similar to **Exhibit B** (the "**Loan Agreement**")[2], and such other documents, instruments and agreements as may be required by the Term Sheet or the Loan Agreement (collectively, the "**DIP Loan Documents**") and perform all such other and further acts as may be necessary or appropriate in connection with the DIP Loan Documents;

(C)  authorizing the Debtor, under Section 364 of the Bankruptcy Code,[3] to obtain postpetition financing and incur postpetition indebtedness under the DIP Facility, which financing and indebtedness due and owing by the Debtor to the DIP Lender shall be secured by senior liens on and security interests in all property of the Debtor, with the exception of causes of action and subject to the Carve-Out for reasonable fees and expenses of professionals for the Debtor (the "**Carve-Out**"), pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, which liens and security interests shall be first-priority security interests in and liens upon all DIP Collateral;

(D)  authorizing the Debtor to grant to the DIP Lender, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim having priority over any and all administrative expenses of and priority claims against the Debtor, subject only to the Carve-Out, as further described in this Motion;

---

[1]  Unless otherwise defined herein, capitalized terms used in this Motion shall have the meaning ascribed to such terms in the Term Sheet.

[2]  The form of Exhibit B is a preliminary draft and continues to be negotiated.  The Debtor will file the final executed version at least two days before the hearing.

[3]  All references herein to the "Bankruptcy Code" are to the applicable section of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

2

(E)     authorizing the Debtor to pay the Thomasboro Secured Lenders in full, with interest, costs, and attorneys' fees;

(F)     modifying and, to the extent necessary, lifting the automatic stay imposed by Section 362 of the Bankruptcy Code to permit the DIP Lender and the Debtor to implement the terms of this Motion, the DIP Loan Documents, and the final order granting this Motion and approving the DIP Facility; and

(G)     granting the Debtor such other and further relief as the Court deems necessary, appropriate, equitable, proper, and consistent with the terms of this Motion.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein include Sections 105, 361, 362, 363, 364, 507 and 545 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## GENERAL BACKGROUND

2.      On February 11, 2022 (the "**Petition Date**"), the Debtor and Galvin's Ridge Landco, LLC ("**Galvin's Ridge**") (and together with Thomasboro, the "**Debtors**") filed with this Court their Voluntary Petitions for Relief under Chapter 11 of the Bankruptcy Code, commencing Case No. 22-10258-JCO and Case No. 22-10260-JCO.

4882-3116-1368, v. 5

**A. Description of Thomasboro**

3.      The Debtor owns 1,137.4 acres of land located in Brunswick County, North Carolina (the "**Thomasboro Property**"). The Thomasboro Property comprises approximately 2,500 entitled residential lots (the "**Entitled Lots**").

4.      The Thomasboro Property was purchased with a purchase money financing loan provided collectively by the following lenders (the "**Thomasboro Secured Lenders**"): Stone Farm Investment, LLC, DeCarol Williamson and LaDane Williamson, as Trustees, DW Legacy Assets, LLC, LW Legacy Assets, LLC, OI Investment Properties, LLC, and OIB Holdings, LLC. As of May 1, 2022, Thomasboro owes the Thomasboro Secured Lenders approximately $12,150,000, plus reasonable attorneys' fees and costs.

5.      On August 26, 2021, Thomasboro and D.R. Horton, Inc. ("**DR Horton**") entered into a Land Purchase Contract (the "**Thomasboro LPC**") pursuant to which DR Horton agreed to purchase the Thomasboro Property upon satisfaction of certain contingencies regarding the development of the Thomasboro Property, as further set forth in the Thomasboro LPC.

6.      The only unsecured creditor is Criteria Development, LLC ("**Criteria Development**"), which is owed approximately $1,266,873.00.

**B. Current Status of the Bankruptcy Cases**

7.      Since the Petition Date, Thomasboro has received interest in the Thomasboro Property from parties other than DR Horton under a variety of potential deal structures. At present, Thomasboro believes the highest and best use of the Thomasboro Property—and the best return for the estate—involves Thomasboro undertaking further development of the Thomasboro Property and pursuing a transaction with buyers other than DR Horton.

8.     Since the Petition Date, the Debtors and DR Horton have been engaged in settlement discussions to resolve various disputes related to Galvin's Ridge, Thomasboro, and the Thomasboro LPC. The Debtors have reached a global settlement with DR Horton and have filed an *Expedited Motion to Approve Compromise with D.R. Horton, Inc.* (the "**Compromise Motion**"). Through the Compromise Motion, the Debtors will seek Court approval of a global settlement between the Debtors and other non-debtor affiliates, on the one hand, and DR Horton on the other hand (the "**Settlement**").

9.     The terms of the Settlement are set forth in further detail in the Compromise Motion, but as it relates to Thomasboro, DR Horton will consent to the termination of the Thomasboro LPC and will waive any potential damages claim on account of such termination. DR Horton will receive a return of its earnest money deposit.

10.     The Settlement frees Thomasboro to pursue a plan of reorganization focused on developing and selling the Entitled Lots. In order to develop the Entitled Lots, Thomasboro requires significant additional financing, and Thomasboro has determined that the DIP Facility is the best available financing to allow it to pay off the Thomasboro Secured Lenders in full and quickly begin development and ultimately pay off Criteria Development.

11.     Thomasboro will be filing a plan of reorganization that incorporates the relief requested herein.

### PROPOSED USE OF FUNDS FROM THE DIP FACILITY AND CASH COLLATERAL

12.     The Debtor will use the proposed DIP Facility to pay off the Thomasboro Secured Lenders in full, to fund operating expenses in connection with the Debtor's development of the Entitled Lots, and to fund professional fees incurred by the Debtor.

4882-3116-1368, v. 5

13.     The Debtor has prepared a monthly budget (the "**Budget**") for the next 17-month period (the "**Budget Period**").  A copy of the Budget is attached as **Exhibit C** to this motion.  As indicated by the Budget, during the Budget Period, the Debtor will need funding in order to finish the development of the Entitled Lots, pay off the Thomasboro Secured Lenders, and to fund costs of administration and pay the unsecured claim of Criteria Development.

14.     The Debtor believes that it will need to borrow funds under the DIP Facility for, among other things, the following items:

    a.    Payment of the allowed secured claim of the Thomasboro Secured Lenders in full;

    b.    Development and construction costs;

    c.    administrative costs for this Chapter 11 case, including legal and other professional fees;

    d.    costs related to preservation and maintenance of the Debtor's assets; and

    e.    other expenses as approved by the Court.

15.     The proposed DIP Facility will enable the Debtor to pay ongoing operating expenses and take the required actions set forth above which are necessary to maintain and improve the value of the Debtor's ongoing concern and its assets.  The Debtor cannot take the actions described above without the DIP Facility.  If the Debtor does not take the actions described above, the value of its ongoing concern and its assets will not be maintained and will diminish substantially.

## TERMS OF THE DIP FACILITY

16.     The Debtor and the DIP Lender acknowledge and agree that the Debtor is in need of significant additional financing in order to pay off the Thomasboro Secured Lenders, continue its development of the Entitled Lots and sustain its restructuring efforts and, in connection

6

therewith, the DIP Lender has agreed to provide a credit facility to the Debtor in the amount of up to $26,000,000 pursuant to the DIP Loan Documents and the order granting this Motion.

17.     Prior to the Petition Date, the Debtor conducted arm's length, good faith negotiations with the DIP Lender. Exercising sound business judgment, the Debtor determined that the proposal for debtor in possession financing advanced by the DIP Lender was the most favorable under the circumstances, could be documented and accessed quickly, and adequately addressed the Debtor's reasonably foreseeable liquidity needs while maximizing the value of the Debtor's assets and estate.  Following discussions with the DIP Lender, the Debtor was able to secure a commitment for the DIP Facility.

18.     The principal features of the DIP Facility, as set forth in the Term Sheet, are as follows:

a.     <u>Amount of DIP Facility</u>.  The DIP Facility will be in the maximum principal amount of up to $26,000,000 (the "<u>DIP Commitment</u>"), with $12,200,000 being funded upon entry of an interim order approving funding.

b.     <u>Overview and Use of Funds</u>. The DIP Facility shall be made available to the Debtor in the aggregate amount of the DIP Commitment for the following uses: (i) Legal fees of the Debtor, including fees and costs to cover the negotiation and filing of this DIP deal; (ii) Refinance/pay down prepetition lender(s), as applicable; (iii) Operating expenses of the Debtor to develop lots; and (iv) Other agreed-on uses.

c.     <u>Conditions Precedent to DIP Draw</u>.  The DIP Lender will make available DIP Facility in multiple draws, provided no event of default shall have occurred and be continuing (such date, the "<u>Effective Date</u>"): (i) The DIP Lender's completion, to its own satisfaction, of any remaining due diligence; (ii) The Debtor's delivery of a fully executed credit agreement in Approved Form;[4] and (iii) The Bankruptcy Court's entry of interim (which will trigger the interim draw) and final financing orders approving the DIP

---

[4] "**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

Loans and otherwise in Approved Form (the "DIP Orders"), which remains in full force and effect.

d.    Interest; Default Interest; Undrawn Line Fee. The outstanding principal amount of the DIP Facility (together with all other due and payable DIP Obligations) shall accrue interest from the Effective Date (i.e., the date of any advances under the DIP Loan) equal to 18.5 percent per annum. While an event of default has occurred and is continuing, such amounts shall accrue an additional 4.75% in interest per year. All such interest and fees shall accrue and be compounded and capitalized monthly and be due and payable in cash upon the Maturity Date.

e.    Prepayments. The DIP Facility shall be mandatorily repaid from, and within 10 days of the Debtor's receipt of, proceeds from any sale or other disposition of DIP Collateral. Any repayment made within 12 months of the Effective Date shall be accompanied by a "Makewhole Fee" of 4.75% of the amount repaid; otherwise, there shall be no prepayment penalty.

f.    Maturity Date. The DIP Loans shall mature, and all unpaid DIP Obligations shall be due and payable, upon the earliest (the "Maturity Date") of (i) twenty-four (24) months after the Effective Date, and (ii) acceleration of the DIP Loans following an event of default.

g.    Superpriority Claims; DIP Liens; DIP Collateral. Subject to a customary carveout for estate professional fees and other administrative expenses (the "Carve-Out"), all DIP Obligations shall constitute DIP Claims,[5] payable from the DIP Collateral and all other property of the Debtor's estate. The DIP Order shall grant the DIP Lender automatically perfected security interests (collectively, the "DIP Liens"), senior to all pre- and postpetition liens, on all property of the Debtor with the exception of causes of action (collectively, the "DIP Collateral"). The DIP Liens shall be subject to a Carve Out for reasonable fees and expenses of professionals for the Debtor.

h.    Break Up Fee. In the event that, after execution hereof, the transaction described herein should not be timely effected for any reason, other than (i) the Bankruptcy Court denying approval of the DIP Loans, or (ii) the DIP Lender declining to provide the DIP

---

[5] "DIP Claims" means "superpriority" administrative-expense claims with priority over (i) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code and (ii) all other unsecured claims against the Debtor.

Commitment to the Debtor, then the DIP Lender shall immediately (and without any further action or notice) be entitled to a fee of 4.75% of the DIP Commitment (the "Break-Up Fee").[6] There shall be no Break-Up Fee in the event that the transaction described herein closes.

19.     The description above is intended as a summary only and is qualified in its entirety by reference to the Loan Agreement and Term Sheet, and to the extent there is any inconsistency between the language of the Loan Agreement, Term Sheet, and the description thereof set forth in this Motion, the Loan Agreement and Term Sheet shall control any such inconsistency.  Each creditor of the Debtor and party in interest should read, consider, and carefully analyze the terms and provisions of the Loan Agreement and the order granting this Motion.

### RELIEF REQUESTED AND GROUNDS FOR RELIEF

20.     The Debtor submits that entry into the DIP Loan Documents is in the best interests of the Debtor, its estate, and creditors in that it provides the Debtor with assurance that the Debtor can pay off the secured debt and continue to advance its business activities.

21.     The Debtor requests authority, pursuant to Sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014, to obtain postpetition loans, advances and other financial accommodations from the DIP Lender under a line of credit in an amount of up to approximately $26,000,000, secured by senior liens on and security interests in all property of the Debtor with the exception of causes of action and subject to the Carve-Out (the "**DIP Collateral**").

---

[6] The Debtor acknowledges that the Break-Up Fee is intended to be an actual, necessary cost and/or expense of preserving its estate and, thus, entitled to priority under Bankruptcy Code section 503(b). The Break-Up Fee, together with all costs of collection, shall be due and payable (if applicable) from and after execution of this Term Sheet by the Debtor, irrespective of the occurrence of the Effective Date.

4882-3116-1368, v. 5

22.     The Debtor further requests authority to enter into the DIP Loan Documents with the DIP Lender.

23.     As additional assurance that the DIP Facility will be repaid, the DIP Lender will be granted and allowed a superpriority administrative expense claim in accordance with Section 364(c)(1) of the Bankruptcy Code having priority and right of payment over any and all other obligations, liabilities, and indebtedness of the Debtor, now in existence or hereafter incurred by the Debtor, and over any and all administrative expenses or priority claims against the Debtor with priority over any and all administrative expenses of the Debtor, whether now existing or hereafter arising or incurred, of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, provided, however, such claim will not have priority over the Carve-Out or U.S. Bankruptcy Administrator quarterly fees.

24.     The Debtor believes that the financing described herein is in its best interest and the best interest of its creditors and its estate.  The financing described herein will allow the Debtor to pay off its secured debt and finish development of the Entitled Lots.  The Debtor's access to the financing described herein will maximize its ability to continue its business without interruption, will provide the Debtor's key constituents, including vendors, suppliers, employees, and customers, with the confidence that the Debtor will have sufficient cash to allow such parties to continue to deal with the Debtor in the ordinary course of business regardless of this case.

25.     The Debtor is presently unable to obtain, in the ordinary course of business or otherwise:

> a.     pursuant to Section 364(a) or 364(b) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense;

10

b.        pursuant to Section 364(c)(1) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code;

c.        pursuant to Section 364(c)(2) of the Bankruptcy Code, credit secured by a lien on property of the estate that is not otherwise subject to a lien;

d.        pursuant to Section 364(c)(3) of the Bankruptcy Code, credit secured by a junior lien on property of the estate that is subject to a lien; or

e.        credit on any basis other than that described in the Term Sheet and Loan Agreement.

26.      After considering all of the alternatives, the Debtor has concluded, in the exercise of its business judgment, that the financing to be provided under the terms of the Term Sheet, Loan Agreement and this Motion is in the best interests of the Debtor, its creditors and other parties in interest. Absent the availability of the funding proposed through the DIP Facility, the Debtor will be forced to curtail or discontinue its business activities. The value of the Debtor would be significantly diminished if development was stopped.

27.      Although the Debtor technically requests a priming lien superior to the liens of the Thomasboro Secured Lenders, those lenders will be paid off upon approval of the financing. The Debtor requests approval to make such payment in the exercise of its business judgement pursuant to Section 363(b) of the Bankruptcy Code. The only other creditor, Criteria Development, consents to the payment.

28.      As set forth in the Motion, the DIP Lender and the Debtor have negotiated the terms and conditions of the DIP Facility in good faith and at arm's-length, and the terms and conditions of the DIP Loan Documents are fair and reasonable and are supported by reasonably equivalent value. The Debtor requests that this Court find that any credit extended by the DIP Lender pursuant

4882-3116-1368, v. 5

to the terms of the DIP Loan Documents will have been extended in "good faith" (as that term is used in Section 364(e) of the Bankruptcy Code).

## Notice

29. No trustee or examiner has been appointed in this case, and no official committees of unsecured creditors or equity security holders have yet been appointed pursuant to Section 1102 of the Bankruptcy Code. Notice of this Motion has been given by (i) the Court's CM/ECF transmission to the Office of the Bankruptcy Administrator and all other parties receiving electronic noticing, and by (ii) U.S. mail to all creditors and parties in interest on the Court's mailing matrix. The Debtor submits that, given the nature of the relief requested herein, no other or further notice need be given. Accordingly, the Debtor requests that the Court enter an order finding that such notice of this Motion is adequate and sufficient and complies with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure.

WHEREFORE, the Debtor respectfully requests that this Court enter an order granting this Motion[7] authorizing the Debtor to obtain financing and grant liens pursuant to 11 U.S.C. §§ 364(c) and (d) in accordance with the terms and conditions of the DIP Loan Documents, authorizing payment of the Thomasboro Secured Lenders in full, authorizing the Debtor's borrowing pursuant to the terms of the order granting this Motion, and granting such other and further relief as may be just and proper.

---

[7] The Debtor intends to file a proposed form of order at least two days prior to the hearing.

12

4882-3116-1368, v. 5

/s/ Edward J. Peterson
Edward J. Peterson
Alabama Bar No. 1848-E68E
Stichter Riedel Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida   33602
Telephone: (813) 229-0144
Email:  epeterson@srbp.com
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the *Debtor's Motion for Final Order Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense Status,* together with attached Exhibits A, B, and C, has been furnished on this 8th day of April, 2022, by either the Court's CM/ECF noticing system or by U.S. mail to all creditors and parties in interest listed on the Court's mailing matrix.

/s/ Edward J. Peterson
Edward J. Peterson

13

4882-3116-1368, v. 5

**Exhibit A**

**Summary of Key Terms of and Conditions for**
**DEBTOR-IN-POSSESSION TERM LOAN FACILITY**

Thomasboro Landco, LLC
<u>c/o</u>: Edward J Peterson, III, Esq.
Stichter, Riedel, Blain & Postler, P.A.
epeterson@srbp.com

**CC: Heather Davey**

The following summarizes the key terms (the "**Term Sheet**") on which certain investment fund(s) for which Legalist DIP GP, LLC serves as general partner (the "**DIP Lender**") are willing to extend postpetition financing (the "**DIP Loans**") to Thomasboro Landco, LLC (the "**Debtor**") in connection with its chapter 11 case pending in the United States Bankruptcy Court for the Southern District of Alabama (the "**Bankruptcy Court**"), in an aggregate amount of $26,000,000 (the "**DIP Commitment**"), with $12,200,000 being funded upon entry of an interim order approving funding.

Prior to satisfaction of the Conditions Precedent to DIP Draw below, this Term Sheet shall be *non-binding for discussion purposes only, and not a commitment to lend*.

| | |
|---|---|
| **Overview** | The DIP Loans shall be made available to the Debtor in the aggregate amount of the DIP Commitment for the following uses:<br><br>1. Legal fees of the Debtor, including fees and costs to cover the negotiation and filing of this DIP deal;<br>2. Refinance/pay down prepetition lender(s), as applicable;<br>3. Operating expenses of the Debtor to develop lots; and<br>4. Other agreed-on uses. |
| **Conditions Precedent to DIP Draw** | The DIP Lender will make available DIP Loans in multiple draws, provided no event of default shall have occurred and be continuing (such date, the "**Effective Date**"):<br><br>1. The DIP Lender's completion, to its own satisfaction, of any remaining due diligence;<br>2. The Debtor's delivery of a fully executed credit agreement in Approved Form;[1] and<br>3. The Bankruptcy Court's entry of interim (which will trigger the interim draw) and final financing orders approving the DIP Loans and otherwise in Approved Form (the "**DIP Order**"), which remains in full force and effect.<br><br>The Debtor shall file a motion for expedited approval of the DIP Loans no later than three weeks from the execution of the Term Sheet, or an additional one-time **"Reserved Funds Fee"** of 1.00% of the DIP Commitment shall be earned. |
| **Interest; Default Interest; Undrawn Line Fee** | The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations (defined below)) shall accrue interest from the Effective Date (i.e., the date of any advances under the DIP Loan) equal to 18.5 percent per annum. While an event of default has occurred and is continuing, such amounts shall accrue an additional 4.75% in interest per year. All such interest and fees shall accrue and be compounded and capitalized monthly and be due and payable in cash upon the Maturity Date. |
| **Prepayments** | The DIP Loans shall be mandatorily repaid from, and within 10 days of the Debtor's receipt of, proceeds from any sale or other disposition of DIP Collateral. Any repayment made within 12 months of the Effective Date shall be accompanied by a "Makewhole Fee" of 4.75% of the amount repaid; otherwise, there shall be no prepayment penalty. |
| **Maturity Date** | The DIP Loans shall mature, and all unpaid DIP Obligations shall be due and payable, upon the earliest (the "**Maturity Date**") of (i) twenty-four (24) months after the Effective Date, and (ii) acceleration of the DIP Loans following an event of default. |

---

[1] "**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

| | |
|---|---|
| **Superpriority Claims; DIP Liens; DIP Collateral** | Subject to a customary carveout for estate professional fees and other administrative expenses, all DIP Obligations shall constitute DIP Claims,[2] payable from the DIP Collateral and all other property of the Debtor's estate. The DIP Order shall grant the DIP Lender automatically perfected security interests (collectively, the "**DIP Liens**"), senior to all pre- and postpetition liens, on all property of the Debtor with the exception of causes of action (collectively, the "**DIP Collateral**"). The DIP Liens shall be subject to a Carve Out for reasonable fees and expenses of professionals for the Debtor. |
| **Break Up Fee** | In the event that, after execution hereof, the transaction described herein should not be timely effected for any reason, other than (i) the Bankruptcy Court denying approval of the DIP Loans, or (ii) the DIP Lender declining to provide the DIP Commitment to the Debtor, then the DIP Lender shall immediately (and without any further action or notice) be entitled to a fee of 4.75% of the DIP Commitment (the "**Break-Up Fee**").[3] There shall be no Break-Up Fee in the event that the transaction described herein closes. |
| **DIP Lender Expenses; Other DIP Obligations** | The Debtor shall pay, no later than the Maturity Date, all reasonable costs and expenses of the DIP Lender incurred in connection with the DIP Loans (collectively, the "**DIP Lender Expenses**"). The DIP Lender Expenses, together with all principal of, and interest and fees on, the DIP Loans, together with any other amount owed by the Debtor in connection therewith, shall constitute "**DIP Obligations**" secured by the DIP Liens. |
| **Miscellaneous Provisions** | Customary and as reasonably required by the DIP Lender, including:<br><br>• Debtor's representations, warranties, and covenants (including budget and reporting);<br>• Stay waiver (notwithstanding Bankruptcy Rule 6004);<br>• Section 364(e) "good faith" findings in favor of the DIP Lender;<br>• Carve Out for reasonable fees and expenses of professionals for the Debtor;<br>• Events of default and DIP Lender's rights and remedies; and<br>• Governing Law (Bankruptcy Code / New York State). |

*Note that this Term Sheet relates solely to a proposed <u>debtor-in-possession financing</u>.*

*The DIP Lender <u>does not offer</u> exit financing or otherwise extend credit to entities outside chapter 11.*

**This Term Sheet shall expire and be without further effect if not signed by both parties by March 23, 2022.**

Accepted and agreed to, as of the first date written above:

**DEBTOR:**

Thomasboro Landco, LLC

By:
Name: J. Marion Uter
Title: Manager

**DIP LENDER:**

LEGALIST DIP GP, LLC, as General Partner

By:
Name: Christian G.B. Haigh
Title: Managing Member

---

[2] "**DIP Claims**" means "superpriority" administrative-expense claims with priority over (i) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code and (ii) all other unsecured claims against the Debtor.

[3] The Debtor acknowledges that the Break-Up Fee is intended to be an actual, necessary cost and/or expense of preserving its estate and, thus, entitled to priority under Bankruptcy Code section 503(b). The Break-Up Fee, together with all costs of collection, shall be due and payable (if applicable) from and after execution of this Term Sheet by the Debtor, irrespective of the occurrence of the Effective Date.

**Exhibit B**

4882-3116-1368, v. 5

**DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT**

**among**

**THOMASBORO LANDCO, LLC,
as Debtor,**

**and**

**Certain Investment Fund(s) for Which
LEGALIST, INC.
Serves as Investment Adviser,
as DIP Lender**

This DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT (the "**Agreement**"), dated as of _____, is entered into among Thomasboro Landco, LLC (the "**Debtor**") and certain investment fund(s) for which Legalist, Inc. serves as investment adviser, as lender, agent, and collateral agent (in such capacities, the "**DIP Lender**").

<u>**RECITALS**</u>

WHEREAS, on February 11, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Alabama (the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and its chapter 11 case is being administered under the caption *In re Thomasboro Landco, LLC*, No. 22-10260 (the "**Case**");

WHEREAS, the Debtor has continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108;

WHEREAS, an immediate and ongoing need exists for the Debtor to obtain funds in order to fund the Case and work toward a successful exit from chapter 11 and, accordingly, the Debtor requested that the DIP Lender extend the DIP Loans;

WHEREAS, the DIP Lender is willing to extend DIP Loans (each a "**DIP Draw**") on the terms hereof in an aggregate maximum amount of $26,000,000 (the "**DIP Commitment**") in accordance with the allocation on Addendum 1;

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the "**Parties**") agree as follows:

<u>**ARTICLE I
DEFINED TERMS**</u>

**Section I.01     Definitions.** As used in this Agreement:

"**Affiliate**" has the meaning given to it in the Bankruptcy Code.

"**Agreement**" has the meaning given to it in the preamble hereto.

"**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

"**Avoidance Actions**" means all claims and causes of action described in Bankruptcy Code chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Borrowing Request**" means an executed borrowing request substantially in the form attached hereto as <u>Exhibit A</u> and otherwise in Approved Form.

"**Budget**" means a budget encompassing, on a monthly basis, the period from the date hereof through the satisfaction of the final Milestone and containing detailed line items of the Debtor's projected receipts and disbursements, in Approved Form, including as the same may be revised by the Debtor from time to time in Approved Form. The Budget as of the date hereof is attached hereto as <u>Exhibit B</u>.

"**Business Day**" means every day that is not a Saturday, Sunday, or Legal Holiday (as defined in Federal Rule of Bankruptcy Procedure 9006(a)(6)).

"**Case**" has the meaning given to it in the Recitals.

"**Debt**" has the meaning given to it in the Bankruptcy Code.

"**Debtor**" has the meaning given to it in the preamble hereto.

"**DIP Claims**" means "superpriority" administrative-expense claims with priority over (x) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code (subject to the Carveout (as defined in the DIP Order)) and (y) all other unsecured claims against the Debtor.

"**DIP Collateral**" means all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), expressly including all Avoidance Actions, together with (in each case) all proceeds thereof; <u>provided</u> that the DIP Collateral shall not include Excluded Collateral.

"**DIP Commitment**" has the meaning given to it in the Recitals.

"**DIP Draw**" has the meaning given to it in the Recitals.

"**DIP Lender**" has the meaning given to it in the preamble hereto.

"**DIP Lender Expenses**" has the meaning given to it in Section 11.03.

"**DIP Liens**" has the meaning given to it in Section 10.02.

"**DIP Loan Documents**" means this Agreement, all Borrowing Requests, the DIP Credit Agreement, the DIP Order, the Budget and related reporting, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the DIP Commitment, DIP Loans, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

"**DIP Loans**" has the meaning given to it in Section 2.01(a).

"**DIP Obligations**" means DIP Lender Expenses, together with all principal of, and interest and fees on (including, without limitation, any applicable Undrawn Line Fee, the Monitoring Fee, Commitment Fee, Underwriting Fee, and any applicable Makewhole Fee) the DIP Loans, any amount owed to any Indemnified Person, and any other amount owed by the Debtor under any DIP Loan Document.

"**DIP Order**" means an order of the Bankruptcy Court approving the DIP Loans in Approved Form.

"**Effective Date**" has the meaning given to it in Section 3.02.

"**Event of Default**" has the meaning given to it in Section 8.01.

"**Excluded Collateral**" means the assets and properties set forth on Schedule 4.

"**Existing Liens**" means the Liens set forth on Schedule 2.

"**Indemnified Liabilities**" has the meaning set forth in Section 7.01.

"**Indemnified Persons**" has the meaning set forth in Section 7.01.

"**Lien**" has the meaning given to it in the Bankruptcy Code.

"**Makewhole Fee**" has the meaning given to it in Section 2.07(c).

"**Maturity Date**" means the earliest to occur of (w) 24 months after the Effective Date of the first DIP Draw, (x) the Debtor's exit from bankruptcy, (y) repayment in full of all outstanding DIP Loans, and (z) the acceleration of the DIP Loans following an Event of Default.

"**Milestones**" means, collectively, the events and corresponding deadlines set forth on Schedule 1.

"**Permitted Senior Liens**" means the Liens set forth on Schedule 3.

"**Permitted Variances**" has the meaning given to it in

"**Person**" has the meaning given to it in the Bankruptcy Code.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Uniform Commercial Code**" has the meaning given to it in Section 11.08. [1]

## ARTICLE II
## DIP LOANS

### Section II.01    In General.

(a)    Subject to the terms hereof, the DIP Lender agrees, upon the Effective Date, to make available to the Debtor, in one or more DIP Draws, term loans in the full amount DIP Commitment (such term loans, the "**DIP Loans**").

(b)    Subject to Section 2.7, all amounts owed hereunder with respect to the DIP Loans shall be paid in full no later than the Maturity Date. Any principal amount of the DIP Loans repaid or prepaid may not be reborrowed.

### Section II.02    Use of Proceeds.    The proceeds of the DIP Loans shall be used by the Debtor solely to:

(i)    Pay DIP Lender Expenses;

(ii)    Pay all other DIP Obligations; and

(iii)    Pay other amounts permitted under the Budget.

(iv)    In no event shall any portion of the DIP Loans be used for payment of fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified

Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender.

### Section II.03    [Omitted].

### Section II.04    Interest; Undrawn Line Fee.

(a)    Interest Rate. The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue interest from the Effective Date at 18.50% per year, which shall accrue and be compounded and capitalized monthly; provided that, if the Debtor failed to move for approval of the DIP Order by April 20, 2022, such interest rate shall include an additional 1.00%.

(b)    Default Interest. While an Event of Default has occurred and is continuing, the outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue an additional 4.75% in interest per year, which shall accrue and be compounded and capitalized monthly. Payment or acceptance of the increased rates of interest provided for in this Section 2.4(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

(c)    [Omitted].

(d)    Payment Terms. All interest (including default interest), shall be compounded and capitalized in arrears on the first Business Day of month and due and payable upon the Maturity Date.

### Section II.05    [Omitted].

### Section II.06    Repayment.    Subject to Sections 2.07, the DIP Loans shall be due and payable, and the Debtor unconditionally agrees and promises to repay to the DIP Lender all other outstanding DIP Obligations, in cash on the Maturity Date.

### Section II.07    Prepayments.

(a)    Voluntary Prepayments. The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning 12 months after the Effective Date, in the minimum amount of $50,000, subject to the contemporaneous payment of the applicable Makewhole Fee.

(b)    Mandatory Repayments. The DIP Loans shall be mandatorily repaid to the extent of, and within 10 Business Days of the Debtor's receipt of, any net proceeds from the sale or other disposition of any DIP Collateral; provided that no such sale or disposition shall occur without the DIP Lender's prior written consent and any such sale or disposition shall be conducted solely in Approved Form; provided further that such any repayment required to be made prior to 12 months after the Effective Date shall be subject to the contemporaneous payment of the applicable Makewhole Fee.

(c)    As used in this Section 2.07, "**Makewhole Fee**" means an additional fee of 4.75% of the amount of voluntarily or required to be repaid, which fee shall be a DIP Obligation for all purposes.

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the DIP Order.

**Section II.08     General Provisions Regarding Payments.**

(a)     Payments. All payments by or on behalf of the Debtor of principal, interest, fees, or other DIP Obligations shall be made in U.S. dollars in same-day funds, without defense, setoff, or counterclaim of any kind, free of any restriction or condition, and delivered to DIP Lender so as to be actually received by it no later than 1:00 PM New York time. All funds actually received by the DIP Lender after that time shall be deemed to have been paid on the next Business Day.

(b)     Non-Conforming Payments. Any payment not conforming to the foregoing Clause (a) shall be deemed a non-conforming payment and shall not be deemed to have been actually received by the DIP Lender until the later of (x) the time such funds become available funds and (y) the next Business Day. Interest and fees shall continue to accrue on any principal (together with all other due and payable DIP Obligations) until such funds become available funds.

(c)     Payments to Include Accrued Interest. All payments in respect of the principal amount of the DIP Loans shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments shall be applied in accordance with Section 8.03.

(d)     Business Days. Whenever a payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next Business Day.

**Section II.09     Termination of Commitments.** The DIP Commitment of the DIP Lender shall be automatically and permanently reduced (x) by the principal amount of each DIP Loan made by the DIP Lender pursuant to Section 2.01(b) and (y) in full, upon (i) acceleration of the DIP Loans under Section 8.02(a)(i) or (ii) the election of the DIP Lender while an Event of Default has occurred and is continuing.

### ARTICLE III
### CONDITIONS PRECEDENT

**Section III.01     Conditions Precedent to DIP Draws.** The obligation of the DIP Lender to make DIP Draws available to the Debtor, in accordance with the Budget, in the aggregate amount of the DIP Commitment (provided no Event of Default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom), is subject to the occurrence (with respect to each such DIP Draw) of all of:

(i)     The Bankruptcy Court's entry of the DIP Order, which remains in full force and effect as so entered and in Approved Form;

(ii)     The Debtor's satisfaction of all applicable Milestones;

(iii)     The DIP Lender's completion of due diligence;

(iv)     The Debtor's delivery of an executed Borrowing Request in the amount of such DIP Draw; and

(v)     Each of the representations and warranties set forth in this Agreement and in each other DIP Loan Document shall be true and correct as of the Effective Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct as of such earlier date.

**Section III.02     Effective Date.** With respect to any DIP Draw, the date on which all of the conditions precedent described in Section 3.01 have been met shall be the "**Effective Date**."

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF DEBTOR

To induce the DIP Lender to provide the DIP Loans, the Debtor makes to the DIP Lender all of following representations and warranties, which representations and warranties shall (x) be deemed to have been made and remade as of each Effective Date and (y) survive the execution and delivery of this Agreement:

**Section IV.01     Corporate Status; Corporate Authorization.**

(a)     The Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business, and the execution, delivery, and performance by the Debtor of this Agreement (x) are within its authority, (y) have been duly authorized, and (z) do not conflict with or contravene its corporate-governance or organizational documents.

(b)     The execution, delivery, and performance of obligations under this Agreement by the Debtor (x) do not require any consent that has not been obtained and (y) are not and will not be in conflict with or prohibited or prevented by any (i) law, rule, or regulation, (ii) corporate-governance or organizational document of the Debtor or (iii) other instrument or agreement, in each case binding on the Debtor or affecting its property.

**Section IV.02     Execution and Binding Effect.** Upon execution and delivery hereof, this Agreement shall constitute the legal, valid, and binding obligation of the Debtor, enforceable in accordance with its terms.

**Section IV.03     DIP Collateral.** The Debtor has good and marketable title to all DIP Collateral, free of all Liens, security interests, pledges, and other encumbrances, other than the DIP Liens and Existing Liens.

**Section IV.04     Absence of Material Adverse Effect.** There has been no act, condition, or event that has had, or may reasonably be expected to have, a material adverse effect on the Debtor or its operations since the Petition Date.

**Section IV.05     Governmental Approvals and Filings.** Except as has already been obtained, no approval, authorization, or other action by, or filing, recording, or registration with, or notice to, any governmental body is or will be necessary in connection with the execution, delivery, or performance of this Agreement.

**Section IV.06     Misstatements and Omissions.** Since the Petition Date, no information furnished or made available by the Debtor (directly or indirectly) to the DIP Lender (including all information contained in the Case's docket) (x) contains any material misstatement of fact or (y) omits any material fact necessary to make such information not misleading.

### ARTICLE V
### AFFIRMATIVE COVENANTS

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section V.01     Budget Reporting and Compliance.**

(a)     No later than the first Tuesday of each month, the Debtor shall provide the DIP Lender (each in Approved Form):

(i)     A variance report (certified by an appropriate officer of the Debtor) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Budget, for both the preceding month and cumulatively from the date hereof, together with detailed explanations of all variances (if any); and

(ii)    A rolling 13-week cashflow forecast for the Debtor.

(b)     In no event shall actual cash receipts vary downward, or cash disbursements vary upward, from the Budget (on a line-item, monthly, or cumulative basis) by more than 7.5% (the "**Permitted Variances**").

**Section V.02     Accounting; Financial Statements.** The Debtor shall keep true and accurate books of record and account in accordance with past practice and the requirements of the Bankruptcy Court and sufficient to permit the preparation of financial statements in accordance with generally accepted accounting principles.

**Section V.03     Maintenance of Existence.** The Debtor shall do all things necessary to maintain (x) its corporate or other existence in accordance with its organizational documents (which shall not be amended without the prior written consent of the DIP Lender) and (y) all rights, licenses, and franchises.

**Section V.04     Preservation of Assets.** The Debtor shall maintain its assets (including all DIP Collateral) in good operating conditions and shall make such repairs and replacements as are required, in accordance with the Budget; provided that, in no event shall the DIP Lender be surcharged with respect to such maintenance of the DIP Collateral.

**Section V.05     Notice of Material Events.** The Debtor shall notify the DIP Lender promptly in writing of:

(i)     The occurrence of any default or Event of Default;

(ii)    Any threatened or pending litigation or other proceeding or claim affecting the Debtor; and

(iii)   Any other development that results in, or could reasonably be expected to result in, a material adverse effect on the Debtor or its operations.

**Section V.06     Use of Proceeds.** The Debtor shall use the proceeds of the DIP Loans only as permitted by Section 2.02.

**Section V.07     [Omitted].**

**Section V.08     Taxes.** The Debtor will pay its tax liabilities accruing after the Petition Date before the same shall become delinquent or in default, except where the validity or amount thereof is being contested in good faith by appropriate proceedings and the Debtor has set aside on its books adequate reserves in accordance with generally accepted accounting principles.

**Section V.09     Milestones.** The Debtor shall comply with all applicable Milestones.

**Section V.10     Compliance with Laws.** The Debtor shall comply with all applicable laws, rules, and regulations.

**Section V.11     Bankruptcy Court Filings.** The Debtor shall commence all actions in, file all motions, applications, and

proposed orders with, and make all other submissions to the Bankruptcy Court only in Approved Form.

**Section V.12     Full Access to Information.** The Debtor shall promptly provide the DIP Lender with all requested information and full and complete access to all executives, directors, and advisors of the Debtor, together with access to inspect any DIP Collateral, when requested by the DIP Lender; provided that, without any prior request from the DIP Lender, the Debtor shall deliver to the DIP Lender in real time copies of all offers (whether formal or informal, firm or contingent) to acquire the Debtor, the DIP Collateral, or any part thereof, together with all related correspondence, and all other materials regarding the Debtor's progress on the Milestones.

**Section V.13     Stay, Extension, and Usury Laws.** The Debtor (x) covenants that it will not at any time in any manner whatsoever claim or take the benefit or advantage of any stay, extension, or usury law (wherever enacted) that may affect the performance in full of this Agreement and (y) expressly waives the benefit of all such laws.

**Section V.14     Timely Payment of DIP Lender Expenses, Other DIP Obligations.** The Debtor shall, in addition to repaying all other DIP Obligations when due and payable hereunder, timely pay all DIP Lender Expenses.

**Section V.15     Further Assurances.** The Debtor shall fully cooperate with the DIP Lender, and take such actions and execute such documents and instruments as the DIP Lender may request, in furtherance of this Agreement and the transactions contemplated hereby, expressly including all steps necessary or desirable to maintain the priority, validity, and enforceability of the DIP Claims and DIP Liens on the DIP Collateral.

## ARTICLE VI
## NEGATIVE COVENANTS

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section VI.01     Indebtedness.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Debt, other than (x) Debt existing as of the Petition Date, (y) the DIP Obligations, and (z) Debt expressly contemplated by the Budget.

**Section VI.02     Liens.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Lien other than (x) Existing Liens and (y) the DIP Liens.

**Section VI.03     Superpriority Claims.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the Budget.

**Section VI.04     Payments.** The Debtor shall not make any payment (other than in respect of the DIP Obligations) not expressly contemplated by the Budget.

**Section VI.05     Merger or Sale.** The Debtor shall not (directly or indirectly) (x) merge or consolidate with another Person or (y) unless the net proceeds thereof shall be sufficient to repay the DIP Obligations (subject to Section 2.07) in full, sell any DIP Collateral; provided any such sale shall be in Approved Form.

**Section VI.06     Business.** The Debtor shall not engage in any business other than its line of business as of the Petition Date.

**Section VI.07    Amendments to Organizational Documents.** The Debtor shall not amend any corporate-governance or organizational document.

**Section VI.08    Bankruptcy Court Filings.** The Debtor shall not commence any action in, file any motion, application, or proposed order with, or make any other submission to the Bankruptcy Court other than in Approved Form.

## ARTICLE VII

## INDEMNIFICATION

**Section VII.01    Indemnification by the Debtor.** The Debtor shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc. and Legalist DIP GP, LLC), together with their respective partners, directors, officers, managers, members, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against, and hold each such Person (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith (collectively, the "**Indemnified Liabilities**"); provided that such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person. The Debtor's payment obligations with respect to any Indemnified Liability shall constitute DIP Obligations for all purposes, and each Indemnified Person not a Party shall be a third-party beneficiary of this Agreement for purposes enforcing such obligations.

## ARTICLE VIII

## EVENTS OF DEFAULT

**Section VIII.01    Events of Default.** The occurrence and continuation of each of the following shall constitute an "**Event of Default**":

(i)    The Debtor shall:

(A)    Fail to timely pay any DIP Lender Expense or other DIP Obligation;

(B)    Grant or permit to exist any Lien on any DIP Collateral, other than the DIP Liens and Existing Liens;

(C)    Fail to satisfy any Milestone, within 2 business days of its stated deadline; or

(D)    Make any payment not expressly contemplated by, or otherwise fail to comply with, the Budget (subject to Permitted Variances);

(ii)    Any representation, warranty, certification, or other statement made, or deemed made in or delivered pursuant to any DIP Loan Document, by the Debtor shall be false in any material respect as of the date so made, deemed made, or delivered;

(iii)    The Bankruptcy Court or another court of competent jurisdiction shall enter an order, without the prior written consent of the DIP Lender:

(A)    Granting adequate protection, under Bankruptcy Code section 361, 362, 363, or 364 or otherwise, to any party, except as set forth in the Budget;

(B)    Granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to any DIP Collateral;

(C)    Surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount, or subjecting the DIP Lender or DIP Collateral to the equitable principle of marshaling;

(D)    Approving credit or debt (other than the DIP Loans) secured by a Lien, under Bankruptcy Code section 364 or otherwise, on any DIP Collateral;

(E)    Approving any administrative-expense claim, expense, or cost against the Debtor (other than the DIP Claims), under Bankruptcy Code section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims;

(F)    Modifying, staying, vacating, or rescinding any part of any DIP Order;

(G)    Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender to be invalid, unenforceable, or otherwise subject to question, challenge, or impairment;

(H)    Enjoining, restraining, or in any other way preventing a Debtor from conducting any material part its business affairs;

(I)    Appointing an examiner or trustee in the Debtor's Case;

(J)    Confirming any chapter 11 plan that does not provide for repayment in full in cash on the effective date of such plan of all outstanding DIP Obligations;

(K)    Converting the Debtor's Case to a case under Bankruptcy Code chapter 7; or

(L)    Dismissing or closing the Debtor's Case;

(iv)    The Debtor, or an Affiliate thereof, shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (or join in or otherwise support the same) (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender;

(v)    Any party (other than the Debtor or an Affiliate thereof) shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender; provided

that the Debtor has not timely filed a reasonable objection or opposition to such action, motion, or other submission; and

(vi)    The Debtor shall fail to perform or comply with any other agreement, covenant, term, or condition in any DIP Loan Document, other than those listed in the preceding Clauses (i)-(v); provided such failure has not been remedied (if capable of remedy) within 21 days of the earlier of (x) the Debtor's becoming aware of such failure or (ii) the Debtor's receipt of written notice from the DIP Lender of such failure.

**Section VIII.02    Remedies.**

(a)    Subject only to the DIP Order, and notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of, or application to, the Bankruptcy Court:

(i)    Declare the DIP Commitment terminated; and

(ii)    Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.

(b)    While any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:

(i)    Terminating the automatic stay with respect to any DIP Collateral;

(ii)    Terminating the Debtor's exclusivity to propose a chapter 11 plan;

(iii)    Appointing an examiner or chapter 11 trustee; and

(iv)    Converting the Debtor's Case to chapter 7.

(c)    If the DIP Lender so moves or applies, the Debtor shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing. The Debtor expressly waives the right to contest such relief whatsoever beyond the foregoing limitation.

(d)    In addition to the rights and remedies enumerated in the foregoing Clauses (a) and (b), the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code.

(e)    For the avoidance of doubt, all costs incurred by the DIP Lender in connection with this Section 8.02 shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

**Section VIII.03    Application of Funds.** If the DIP Lender receives any payment from or on behalf of the Debtor, or collects any money or property pursuant to this Article VIII, it shall pay out the money or property as follows:

(i)    First: To the DIP Lender, for accrued and unpaid DIP Lender Expenses;

(ii)    Second: To the DIP Lender, for accrued and unpaid interest (including default interest) and applicable fees;

(iii)    Third: To the DIP Lender, for unpaid principal outstanding on the DIP Loans;

(iv)    Fourth: To the DIP Lender, for all other unpaid DIP Obligations (including reasonable reserves for Indemnified Liabilities and other contingent DIP Obligations); and

(v)    Fifth: After all DIP Obligations (including reasonable reserves) have been indefeasibly paid in full in cash and the DIP Commitment has terminated, the DIP Lender shall distribute any surplus in accordance with a final, non-appealable Bankruptcy Court order.

For the avoidance of doubt, the Debtor shall remain liable for any deficiency.

**ARTICLE IX**
**[OMITTED]**

**ARTICLE X**
**COLLATERAL, SECURITY, AND PRIORITY**

**Section X.01    DIP Claims.** The Debtor covenants, represents, and warrants that, upon entry of the DIP Order, all DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute DIP Claims, payable from and having recourse to all property of the Debtor's estates (expressly including all DIP Collateral).

**Section X.02    Grant of Security Interest.** Subject to the priorities set forth in Section 10.03, as to all DIP Collateral, the Debtor assigns and conveys as security, grants a security interest in and Lien on, hypothecates, mortgages, pledges, and sets over and unto the DIP Lender all right, title, and interest of the Debtor in the DIP Collateral (collectively, the "**DIP Liens**"), including all Avoidance Actions. The Debtor acknowledges that, pursuant to the DIP Order, the DIP Liens granted to the DIP Lender in all DIP Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law.

**Section X.03    DIP Liens.** The Debtor covenants, represents, and warrants that, upon entry of DIP Order, the DIP Liens shall comprise:

(i)    Pursuant to Bankruptcy Code section 364(c)(2), an automatically perfected, senior DIP Lien on all DIP Collateral not subject to Existing Liens;

(ii)    Pursuant to Bankruptcy Code section 364(c)(3), an automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens;

(iii)    Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, equal DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens; and

(iv)    Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, senior DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens.

**Section X.04    Further Assurances.** The Debtor further agrees that, if requested by the DIP Lender, it shall enter into any separate security agreement, control agreement, pledge agreement, or other similar documentation or instrument with respect to any DIP Collateral that the DIP Lender may request, all expenses of which incurred by the DIP Lender shall constitute DIP Lender Expenses.

## ARTICLE XI
## MISCELLANEOUS

**Section XI.01    Amendments and Waivers.** No amendment, modification, termination, or waiver of any provision hereof, or consent to any departure by the Debtor therefrom, shall be effective without the express written consent of the DIP Lender. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Debtor in any given instance shall entitle the Debtor to any other or further notice or demand in similar or other circumstances.

**Section XI.02    Notices.** All notices, requests, demands, and other communications under any DIP Loan Document shall be in writing, delivered by electronic mail as follows, and deemed effective upon delivery:

(i)     If to the Debtor:

Attn: J. Marion Uter (marion@criteriadevelopment.com)

With a copy (which shall not constitute notice) to:

Stichter, Riedel, Blain & Postler, P.A.
Attn: Edward J. Peterson, III, Esq. (epeterson@srbp.com)

(ii)     If to the DIP Lender:

c/o Legalist, Inc. (dip@legalist.com)

**Section XI.03    DIP Lender Expenses.** Whether or not the transactions contemplated hereby are consummated or any DIP Loan is made, the Debtor agrees to pay promptly all costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to the Debtor or its Case, the DIP Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any default or Event of Default, including (without limitation) all costs of inhouse counsel, advisers, and consultants of DIP Lender, together all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by the DIP Lender with respect thereto (collectively, the "**DIP Lender Expenses**"), which shall constitute DIP Obligations for all purposes hereunder. The foregoing shall be in addition to, and shall not limit, any other provision of the DIP Loan Documents regarding DIP Obligations to be paid by the Debtor.

**Section XI.04    Enforceability; Successors and Assigns.** This Agreement shall be binding on and inure to the benefit of, and shall be enforceable by, the respective successors and permitted assigns of the Parties. No Debtor may assign any DIP Loan Document without the DIP Lender's prior written consent. Any such alleged assignment shall be void *ab initio* and shall not relieve the Debtor of any obligation hereunder.

**Section XI.05    Integration.** The DIP Loan Documents contain and constitute the entire agreement of the Parties with respect to the subject matter thereof and supersede all prior negotiations, agreements, and understandings, whether written or oral.

**Section XI.06    No Waiver; Remedies Cumulative.** No failure or delay by the DIP Lender in exercising any right, power, or privilege hereunder shall operate as a waiver thereof. A single or partial exercise of any right, power, or privilege shall not preclude any other or further exercise of the same or another right, power, or privilege. The rights and remedies provided in the DIP Loan

Documents shall be cumulative and not exclusive of any right or remedy provided by law or equity or otherwise available.

**Section XI.07    Submission to Jurisdiction.** Each Party agrees that any action with respect to any DIP Loan Document shall be brought exclusively in the Bankruptcy Court and unconditionally submits to the Bankruptcy Court's jurisdiction regarding the same.

**Section XI.08    Governing Law.** The DIP Loan Documents, and any dispute arising therefrom, shall be governed by the Bankruptcy Code and, to the extent not preempted thereby, New York state law. This Agreement constitutes an instrument for the payment of money only, within the meaning of N.Y. C.P.L.R. § 3213. Any reference herein to the "**Uniform Commercial Code**" refers to the New York Uniform Commercial Code as in effect from time to time.

**Section XI.09    WAIVER OF JURY TRIAL.** EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE ARISING FROM THIS AGREEMENT.

**Section XI.10    Severability.** If any term of any DIP Loan Document is held invalid, illegal, or incapable of being enforced by any rule of law or public policy, all terms of such DIP Loan Document shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated thereby is not affected in any manner adverse to any party thereto. Upon such holding, the Parties shall negotiate in good faith to modify the same such that the transactions contemplated thereby are fulfilled to the maximum extent possible.

**Section XI.11    Survival.** All representations, warranties, covenants, and agreements made by the Debtor in any DIP Loan Document shall survive until full and indefeasible payment of all DIP Obligations, irrespective of any earlier default, Event of Default, acceleration, or termination thereunder; provided that Article VII and Section 11.3 shall survive such full and indefeasible payment of all DIP Obligations.

**Section XI.12    Maximum Lawful Interest.** Notwithstanding anything to the contrary herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final and non-appealable order, deem applicable. The Debtor and the DIP Lender, in executing and delivering this Agreement, intend legally to agree on the rate or rates of interest and other charges for the use of money and manner of payment permitted by such law; provided that, if such amount exceeds such maximum allowable amount, then the Debtor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtor in excess of such legal maximum shall be applied to reduce the principal balance of the DIP Loans to the extent of any such excess.

**Section XI.13    Foreseeable Circumstances.** The Parties acknowledge that (x) the COVID-19 pandemic any/or other instances of pandemic or widespread virus or infection and (y) ongoing riots, insurrections, terrorist acts, and/or other domestic unrest and uncertainty shall not be considered unforeseeable circumstances for purposes of this Agreement. The Parties agree that any claim of unenforceability, force majeure, or other claim

and/or defense related to the foregoing (including with respect to any court closure) is expressly waived.

**Section XI.14**     <u>Execution in Counterparts.</u> Each DIP Loan Document may be executed, including electronically, in any number of counterparts and by different Parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same DIP Loan Document.

*        *        *

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized signatories as of the date first written above.

**DEBTOR:**

THOMASBORO LANDCO, LLC

By: _____
Name: J. Marion Uter
Title: Manager

**DIP LENDER:**

LEGALIST, INC., solely in its capacity as investor adviser to the investment fund(s) listed on Addendum 1


By: _____
Name: Brian T. Rice
Title: Chief Operating Officer

| Schedule 1 | | Schedule 2 |
|---|---|---|
| **(Milestones)** | | **(Existing Liens)** |

| Event | Deadline |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

DRAFT

| **Schedule 3** | **Schedule 4** |
| --- | --- |
| **(Permitted Senior Liens)** | **(Excluded Collateral)** |
| None. | None. |



## Exhibit A
### (Form of Borrowing Request)

Legalist DIP Fund I, LP
Legalist DIP SPV II, LP
c/o    Legalist, Inc. (dip@legalist.com)

RE:    *In re Thomasboro Landco, LLC*, Case No. 22-10260

Ladies and Gentlemen:

This Borrowing Request is delivered to you pursuant to Article III of the Debtor-in-Possession Term Loan Credit Agreement, dated as of _____ (as in effect from time to time, the "Credit Agreement"), among Thomasboro Landco, LLC (the "Debtor") and the addressee(s) hereof (the "DIP Lender"). The Debtor acknowledges that this Borrowing Request is a DIP Loan Document for all purposes. Capitalized term used but not defined herein have the meanings given to them in the Credit Agreement

The Borrower hereby requests that a DIP Loan be made to it in the aggregate principal amount of $_____ (the "DIP Draw").

The Debtor hereby acknowledges that, pursuant to Credit Agreement Section 3.01(v), each of the representations and warranties set forth in the Credit Agreement and in each other DIP Loan Document shall be true and correct as of the date hereof, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and/or warranty shall have been true and correct as of such earlier date. The Debtor agrees that if, at any time prior to the time the DIP Draw is funded by the DIP Lender, any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the DIP Lender.

Please wire transfer the proceeds of the DIP Draw as follows:

Account Name: _____
Bank: _____
ABA (for wires): _____
Account No.: _____

Beneficiary Address: _____
_____
Phone No. (Debtor): _____


Very truly yours,

THOMASBORO LANDCO, LLC

By: _____
Name: J. Marion Uter
Title: Manager

**Exhibit B**
**(Budget)**



**<u>Addendum 1</u>**
**(Allocation of DIP Commitment)**

- Legalist DIP Fund I, LP: XX%

- Legalist DIP SPV II, LP: XX%



**Exhibit C**

4882-3116-1368, v. 5

Project Start Date **May-22**

| | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Bank Balance** | 100 | - | - | - | - | - | - | - | 5,103,507 | 3,522,143 | 1,794,356 | - | - | - | - | 2,018,092 | 1,968,404 |
| **Inflows** | | | | | | | | | | | | | | | | | |
| Finished Lots Sales (Developed) | - | - | - | - | - | - | - | - | - | - | - | - | 12,065,000 | 8,500,000 | 11,175,000 | - | - |
| Sale of Lots (Undeveloped) | - | - | - | - | - | - | - | 5,000,000 | - | - | - | - | - | - | - | - | - |
| Financing Draws | 11,442,330 | 221,413 | 458,239 | 671,751 | 911,512 | 1,856,807 | 2,031,159 | - | - | - | 267,923 | 2,426,158 | 2,936,215 | 1,650,275 | - | - | - |
| EMD | 1,650,000 | - | - | - | - | - | - | 2,500,000 | - | - | - | - | - | - | - | - | - |
| **Total Inflows** | 13,092,330 | 221,413 | 458,239 | 671,751 | 911,512 | 1,856,807 | 2,031,159 | 7,500,000 | - | - | 267,923 | 2,426,158 | 15,001,215 | 10,150,275 | 11,175,000 | - | - |
| **Outflows** | | | | | | | | | | | | | | | | | |
| *LENNAR - NORTH 156 LOTS* | | | | | | | | | | | | | | | | | |
| Construction | - | (191,413) | (160,991) | (278,837) | (185,093) | (585,263) | (801,180) | (558,370) | (741,224) | (741,238) | (766,008) | (1,104,863) | (1,084,555) | (77,000) | (77,000) | - | - |
| Land (Payoff of Secured Debt) | (6,553,532) | | | | | | | | | | | | | | | | |
| Development Tasks *** | (373,430) | (30,000) | (95,000) | (15,000) | (95,969) | (68,979) | (68,979) | (68,979) | (68,979) | (68,979) | (166,156) | (377,242) | (432,073) | (67,978) | (88,097) | (29,689) | (340,179) |
| *MUNGO - SOUTH 149 - 42' LOTS* | | | | | | | | | | | | | | | | | |
| Construction | - | - | - | (178,364) | (323,700) | (566,000) | (456,000) | (907,534) | (351,550) | (422,000) | (388,605) | (248,743) | (483,268) | (434,575) | (270,234) | - | - |
| Land (Payoff of Secured Debt) | (3,378,810) | | | | | | | | | | | | | | | | |
| Development Tasks *** | (284,000) | - | (12,000) | (12,000) | (12,000) | (12,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (165,320) | (420,500) | (198,543) | (5,000) | (188,476) |
| *CAVINESS & CATES - SOUTH 100 - 52' LOTS* | | | | | | | | | | | | | | | | | |
| Construction | - | - | (190,248) | (187,550) | (229,750) | (559,565) | (578,000) | (734,610) | (292,610) | (368,570) | (614,511) | (508,310) | (351,000) | (351,841) | (10,000) | - | - |
| Land (Payoff of Secured Debt) | (2,267,658) | | | | | | | | | | | | | | | | |
| Development Tasks *** | (235,000) | - | - | - | (65,000) | (65,000) | (65,000) | (65,000) | (65,000) | (65,000) | (65,000) | (125,000) | (420,000) | (298,381) | (15,000) | (15,000) | (142,937) |
| *FINANCING COSTS* | | | | | | | | | | | | | | | | | |
| Loan/Interest Payments | - | | | | | | | | | | | | (12,065,000) | (8,500,000) | (8,498,034) | | |
| **Total Outflows** | (13,092,430) | (221,413) | (458,239) | (671,751) | (911,512) | (1,856,807) | (2,031,159) | (2,396,493) | (1,581,364) | (1,727,787) | (2,062,279) | (2,426,158) | (15,001,215) | (10,150,275) | (9,156,908) | (49,689) | (671,592) |
| **Net Cash Flows** | (100) | - | - | - | - | - | - | 5,103,507 | (1,581,364) | (1,727,787) | (1,794,356) | - | - | - | 2,018,092 | (49,689) | (671,592) |
| **Ending Bank Balance** | - | - | - | - | - | - | - | 5,103,507 | 3,522,143 | 1,794,356 | - | - | - | - | 2,018,092 | 1,968,404 | 1,296,812 |

| **Debt / Loan Balance** $26,000,000 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Proceeds from Financing | 11,442,330 | 221,413 | 458,239 | 671,751 | 911,512 | 1,856,807 | 2,031,159 | - | - | - | 267,923 | 2,426,158 | 2,936,215 | 1,650,275 | - | - | - |
| Accrued Interest 18.50% | - | 176,403 | 189,600 | 202,879 | 220,059 | 252,078 | 287,278 | 291,707 | 296,204 | 300,770 | 309,538 | 351,713 | 402,402 | 248,045 | 120,827 | (8,321) | (8,449) |
| Payments on Debt | - | | | | | | | | | | | | (12,065,000) | (8,500,000) | (8,498,034) | | |
| Outstanding Balance (totals) | 11,442,330 | 11,840,146 | 12,487,985 | 13,362,615 | 14,494,186 | 16,603,071 | 18,921,509 | 19,213,215 | 19,509,419 | 19,810,189 | 20,387,650 | 23,165,521 | 14,439,138 | 7,837,458 | (539,749) | (548,070) | (556,519) |
| STATUS | | | | | | | | | | | | | | | | | |
| SHORTFALL | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

***NOTE - Includes $95,086.51 for
Legal Professional Fees