UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

In re:                                                          Chapter 11

THOMASBORO LANDCO, LLC,                                         Case No. 22-10260

    Debtor.
_____/

FINAL ORDER AUTHORIZING
DEBTOR-IN-POSSESSION FINANCING

THIS CASE came before the Court for a final hearing on May 10, 2022, at 8:30 a.m. Central Daylight Time (the "Hearing"), for consideration of the *Debtor's Motion for Final Order Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense* (the "Motion") (Doc. No. 51) filed by Thomasboro Landco, LLC (the "Debtor") in its Chapter 11 case (the "Case"), seeking entry of a final order (this "Final DIP Order"), *inter alia:*

    1.    Authorizing the Debtor to obtain postpetition financing, consisting of senior secured superpriority term loans (the "DIP Loans") in an aggregate maximum amount of $26,000,000.00 (the "DIP Commitment"), from certain investment fund(s) for which Legalist, Inc. serves as investment advisor, as lender, agent, and collateral agent (in such capacities, the "DIP Lender"), as provided in that certain Debtor-in-Possession Term Loan Credit Agreement, dated as of the date hereof, by and among the Debtor and the DIP Lender (the "DIP Credit Agreement")[1], and to incur the DIP Obligations contemplated thereby;

---

[1] Capitalized terms used but not defined in this Final DIP Order have the meanings given to them in the DIP Credit Agreement, a copy of which is on file with the Court at Doc. No. 83.

2. Authorizing the Debtor to execute and enter into the DIP Credit Agreement, and to perform all acts necessary or desirable to consummate the transactions contemplated by the DIP Credit Agreement and the other DIP Loan Documents;

3. Authorizing the Debtor to use the proceeds of the DIP Loans, as permitted in the DIP Loan Documents;

4. Authorizing the Debtor to grant to the DIP Lender, in accordance with section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim having priority over any and all administrative expenses of and priority claims against the Debtor, subject only to the Carveout (as hereinafter defined), the Existing Liens, and, until payment of the Senior Lender Payoff Amount to the Senior Lenders as provided in Paragraph 6 below, the Senior Lender Liens, as further described in the Motion and in this Final DIP Order, payable from and having recourse to all DIP Collateral;

5. Authorizing the Debtor to grant to the DIP Lender automatically perfected DIP Liens (as hereinafter defined) in all DIP Collateral to secure repayment of all DIP Obligations, comprising:

    (i) pursuant to Bankruptcy Code section 364(c)(2), an automatically perfected, senior DIP Lien on all DIP Collateral not subject to any Liens;

    (ii) pursuant to Bankruptcy Code section 364(c)(3), an automatically perfected, junior DIP Lien on all DIP Collateral that is subject to a Lien;

    (iii) pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, equal DIP Lien on all DIP Collateral subject to Existing Liens and, until payment of the Senior Lender Payoff Amount to the Senior Lenders as provided in Paragraph 6 below, the Senior Lender Liens; and

    (iv) pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, senior DIP Lien on all DIP Collateral subject to Existing Liens and, until payment of the Senior Lender Payoff Amount to the Senior Lenders as provided in Paragraph 6 below, the Senior Lender Liens;

6. Vacating and/or modifying the automatic stay, pursuant to Bankruptcy Code section 362, to the extent necessary to (a) consummate the transactions contemplated by the DIP Loan Documents and (b) permit the DIP Lender to exercise any right or remedy provided in the DIP Loan Documents; and

7. Granting the Debtor such other and further relief as is just and proper.

8. The only objection filed to the Motion was the *Limited Objection and Response to the Debtor's Motion for Final Order Authorizing the Debtor to Obtain Postpetition Financing and Grant Senior Liens and Superpriority Administrative Expense* filed by Stone Farm Investment, LLC, OIB Holdings, LLC, OI Investment Properties, LLC, DW Legacy Assets, LLC, LW Legacy Assets, LLC, and Decarol Williamson and Ladane Williamson as Trustees of the Virginia Alma Williamson Trust Under the Will of Odell Williamson dated September 9, 2010 (the "Stone Farm Objection").

The Court, having considered the contents of the Motion, any objections to the Motion (including the Stone Farm Objection), the record, and the statements of counsel at the Hearing, finds that the Motion is well taken and should be granted. Accordingly, it is

FOUND and CONCLUDED that:

A. On February 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Bankruptcy Code chapter 11;

B. This Court has jurisdiction over the Case and the Motion under 28 U.S.C. §§ 157(b) and 1334, this matter is a core proceeding under 28 U.S.C. § 157(b)(2), venue is proper under 28 U.S.C. §§ 1408 and 1409, and the Court has authority to enter this Final DIP Order consistent with Article III of the United States Constitution;

C. An immediate and ongoing need exists for the Debtor to obtain postpetition financing in the amount of the DIP Commitment to reorganize under Bankruptcy Code chapter 11, and the Debtor does not otherwise have sufficient funds available to pay administrative expenses in this Case;

D. The Debtor is unable to obtain unsecured credit under Bankruptcy Code section 503 or other postpetition financing in the amount of the DIP Commitment on terms more favorable than those provided by the DIP Lender;

E. Sufficient and adequate notice of the Motion and entry of this Final DIP Order has been given under Bankruptcy Code section 364 and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002 and 4001, such that no other or further notice of the Motion or entry of this Final DIP Order is needed;

F. The terms of the DIP Loans, as set forth in the DIP Loan Documents, have been negotiated in good faith and at arm's length between the Debtor and the DIP Lender, and the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e) with respect to all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, DIP Loan Documents, and rights and remedies of the DIP Lender under the DIP Loan Documents;

G. The terms of the DIP Loans, as set forth in the DIP Loan Documents, are fair and reasonable and reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and the DIP Lender has provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the DIP Liens, the DIP Claims, and all other rights, protections, and benefits obtained by the DIP Lender under any DIP Loan Document;

H. Entry of this Final DIP Order is in the best interests of the Debtor's estate and its various stakeholders because it will, *inter alia*, allow the Debtor to reorganize under Bankruptcy Code chapter 11; and

I. The DIP Lender is willing to provide the DIP Loans to the Debtor, but only on the terms of the DIP Loan Documents.

The above findings having been made by the Court, and for the reasons stated on the record and in open court at the Hearing, it is

ORDERED that:

1. The Motion is GRANTED on a final basis.

2. Any remaining objection to the Motion or entry of this Final DIP Order is hereby overruled; provided, that the Stone Farm Objection is conditionally overruled without prejudice.

3. The execution and delivery of the DIP Credit Agreement and all other DIP Loan Documents by the Debtor is authorized and approved, and the Debtor is authorized and empowered to (a) execute and deliver to the DIP Lender all other documents and instruments necessary or desirable to consummate the transactions contemplated thereby, (b) take all other actions necessary or desirable to carry out the intent and purpose of the DIP Loan Documents, and (c) otherwise comply with the DIP Loan Documents.

4. The DIP Loan Documents are approved in all respects and incorporated herein by reference. Following execution of the DIP Loan Documents, the Debtor and the DIP Lender may enter into any non-material amendments of or modifications to the DIP Loan Documents without the need for further notice and hearing or order of this Court.

5. The Debtor is authorized to borrow up to the full amount of the DIP Commitment in DIP Loans in one or more DIP Draws on the terms set forth in the DIP Loan Documents and as provided in the final budget attached as <u>Exhibit A</u> to this Final DIP Order (as amended, modified or supplemented from time to time with the consent of the DIP Lender, the "Budget"), and in this Final DIP Order, without application to or further order by the Court. In no event

shall actual cash disbursements vary upward from the cash disbursements set forth in the Budget (on a line-item, monthly, or cumulative basis) by more than ten percent (10%).

6. Notwithstanding anything to the contrary in the DIP Credit Agreement or any other DIP Loan Document, on the date of execution and delivery of the DIP Credit Agreement and all other DIP Loan Documents by the Debtor (the "DIP Closing Date"), the Debtor is authorized and directed to take a DIP Draw in the amount necessary to pay off and satisfy the allowed secured claims, including principal, interest, late fees, and attorneys fees (collectively, the "Senior Lenders Payoff Amount"), of Stone Farm Investment, LLC, OIB Holdings, LLC, OI Investment Properties, LLC, DW Legacy Assets, LLC, LW Legacy Assets, LLC, and Decarol Williamson and Ladane Williamson as Trustees of the Virginia Alma Williamson Trust Under the Will of Odell Williamson dated September 9, 2010 (collectively, the "Senior Lenders"). The Senior Lenders Payoff Amount shall also include the amount necessary to satisfy 2021 real estate taxes due to The Brunswick County Revenue Office for Parcel Number 22600001 in the amount of $19,628.28, plus accrued interest, if any, and Parcel Number 2260000101 in the amount of $3,125.42, plus accrued interest, if any. The Senior Lenders Payoff Amount shall be paid to the Senior Lenders on the DIP Closing Date directly by the DIP Lender by wire transfer to the account designated by counsel for the Senior Lenders. Upon receipt of the Senior Lenders Payoff Amount, the Senior Lenders shall cause documentation releasing the Senior Lender Liens (executed and in proper form for recordation) to be delivered to the Debtor. Payment of the Senior Lenders Payoff Amount shall be in full and final satisfaction of any and all claims (secured, unsecured, priority, and administrative) of the Senior Lenders against the Debtor or any property of the Debtor. Notwithstanding anything in the DIP Loan Documents or this Final DIP Order to the contrary, the DIP Liens shall not prime or otherwise have priority over the Senior Lender Liens until payment in full of the Senior Lenders Payoff Amount to the Senior Lenders.

7. All interest, fees, and expenses (expressly including all DIP Lender Expenses) contemplated by the DIP Loan Documents are authorized to be incurred by the Debtor as DIP Obligations and approved for payment as DIP Claims, without application to or further order by the Court.

8. All DIP Obligations, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute a superpriority administrative expense claim having priority over any and all administrative expenses of and priority claims against the Debtor, subject to the Carveout, the Existing Liens, and, until payment of the Senior Lender Payoff Amount to the Senior Lenders as provided in Paragraph 6 above, the Senior Lender Liens, payable from and having recourse to all DIP Collateral.

9. The DIP Lender holds security interests in and liens on all DIP Collateral, subject to the Carveout, which the Debtor has (to the extent of its right, title, and interest therein) assigned and conveyed as security, hypothecated, mortgaged, pledged, and set over and unto the DIP Lender, and which have been automatically perfected notwithstanding any notice or recordation requirements of non-bankruptcy law (collectively, the "DIP Liens"), comprising:

(i) pursuant to Bankruptcy Code section 364(c)(2), an automatically perfected, senior DIP Lien on all DIP Collateral not subject to any Liens;

(ii) pursuant to Bankruptcy Code section 364(c)(3), an automatically perfected, junior DIP Lien on all DIP Collateral that is subject to a Lien;

(iii) pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, equal DIP Lien on all DIP Collateral subject to Existing Liens and, until payment of the Senior Lender Payoff Amount to the Senior Lenders as provided in Paragraph 6 above, the Senior Lender Liens; and

(iv) pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, senior DIP Lien on all DIP Collateral subject to Existing Liens and, until payment of the Senior Lender Payoff Amount to the Senior Lenders as provided in Paragraph 6 above, the Senior Lender Liens.

10. The proceeds of the DIP Loans shall be used by the Debtor exclusively to (a) pay DIP Lender Expenses, (b) pay all other DIP Obligations, (c) pay the Senior Lenders Payoff Amount, (d) pay legal fees of counsel to the Debtor, and (e) pay other amounts permitted under the Budget and this Final DIP Order; <u>provided</u> that no portion of the DIP Loans shall be used for fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) challenging or taking any other action that could reasonably be expected otherwise to impair, any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, DIP Loan Document, or right or remedy of the DIP Lender.

11. So long as any DIP Obligation remains outstanding, the Debtor shall perform each covenant contained in the DIP Loan Documents (other than those covenants that, under the DIP Loan Documents, shall survive full and indefeasible payment of the DIP Obligations).

12. The DIP Loans shall mature, and all DIP Obligations shall be immediately due and payable, upon the Maturity Date. Notwithstanding anything to the contrary contained in the DIP Loan Documents, this Final DIP Order or any other order of the Court, the Maturity Date shall not occur on the effective date of any confirmed plan of reorganization in this case.

13. An Event of Default shall exist during the occurrence and continuation of each of the events so identified as an "Event of Default" in the DIP Credit Agreement.

14. Notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of or application to this Court:

    (i) Declare the DIP Commitment terminated; and

    (ii) Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.

15. Furthermore, while any Event of Default has occurred and is continuing, the DIP Lender may move or apply to this Court for entry of an order:

    (i)    Terminating the automatic stay with respect to any DIP Collateral;

    (ii)    Appointing an examiner or chapter 11 trustee; or

    (iii)    Converting the Debtor's Case to chapter 7.

16. In addition to the rights and remedies enumerated in Paragraphs 14 and 15 above, the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code. For the avoidance of doubt, all costs incurred by the DIP Lender in connection with any default or Event of Default under any DIP Loan Document shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

17. In consideration of the DIP Lender's (a) consent to the current payment of administrative expenses of the Debtor's estate to the extent of the Budget and (b) concessions with respect to the Carveout, as described Paragraphs 18 and 19 below, the DIP Lender is entitled to a full and complete waiver, with respect to all parties, of Bankruptcy Code section 506(c) and in no event shall the DIP Lender or the DIP Collateral be subject to any "surcharge" or the doctrine of "marshalling" by any party in any way whatsoever.

18. Notwithstanding anything in this Final DIP Order or any DIP Loan Document or any other order of this Court to the contrary, the DIP Claims and the DIP Liens shall be subject to payment of the Carveout. As used in this Final DIP Order, "Carveout" means: (a) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the United States Bankruptcy Administrator for the Southern District of Alabama (the "Bankruptcy

Administrator"); (b) all unpaid professional fees and disbursements allowed by the Court under sections 327, 328, 330 or 363 of the Bankruptcy Code (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued, at any time prior to the Carveout Trigger Date (as hereinafter defined), by professionals retained by the Debtor in this Case and by the Debtor's ordinary course professionals (the "Debtor's Professionals"), in an aggregate amount not exceeding the budgeted amounts for such unpaid professional fees and disbursements as reflected in the Budget (plus any professional fees and disbursements incurred following the Petition Date and prior to the starting date of the Budget) excluding the amount of any prepetition retainers or deposits held by such Debtor's Professionals; and (c) any allowed fees, expenses, costs, or disbursements incurred by the Debtor's Professionals after the Carveout Trigger Date subject to the Triggered Carveout Cap (as hereinafter defined).

19. Unless and until the Carveout Trigger Date, the Debtor shall pay administrative expenses of the Case, including fees and disbursements of the Debtor's Professionals allowed by the Court under sections 327, 328, 330 or 363 of the Bankruptcy Code, in the ordinary course as permitted by the Budget or this Final DIP Order (including putting funds into escrow with counsel to the Debtor) or as otherwise consented to by the DIP Lender. Notwithstanding the Budget or anything else herein or in any other DIP Loan Document to the contrary, from and after the date of entry of an order of the Court that an Event of Default has occurred under the DIP Credit Agreement (the "Carveout Trigger Date"), following notice by the DIP Lender to the Debtor, counsel to the Debtor, and to the Bankruptcy Administrator of notice that both (a) an Event of Default has occurred and is continuing and (b) the DIP Lender has triggered the Carveout, such administrative expenses shall be funded solely from an amount, not to exceed 2.50% of the DIP Loans then outstanding, to be funded from a DIP Draw and set aside solely for (x) fees, expenses, and costs then due and payable to the Bankruptcy Administrator and/or Clerk

of the Court, plus (y) the unpaid fees, costs, and disbursements of the Debtor's Professionals that are incurred after the Carveout Trigger Date, and which are allowed by the Court under sections 327, 328, 330 or 363 of the Bankruptcy Code (exclusive of any unused prepetition retainers held by such professionals) (together, the "Triggered Carveout Cap"); provided that in no event shall:

(i) Payment of any amount contemplated by the Carveout or any portion of the Triggered Carveout Cap constitute a personal liability of the DIP Lender, any Affiliate thereof, or any other Indemnified Person; or

(ii) Any amount contemplated by the Carveout or any portion of the Triggered Carveout Cap be used to fund fees, costs, or expenses incurred in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, DIP Loan Document, or right or remedy of the DIP Lender.

For the avoidance of doubt, from and after the Carveout Trigger Date, the Debtor shall pay administrative expenses thereafter incurred solely as permitted under this Final DIP Order.

20. The automatic stay imposed by Bankruptcy Code section 362(a) is and shall remain modified to the extent necessary to implement and effectuate in full this Final DIP Order and the other DIP Loan Documents (expressly including any exercise of rights and remedies by the DIP Lender under the DIP Loan Documents) and the transactions contemplated thereby.

21. Any stay, modification, reversal, or vacation of this Final DIP Order shall not, in any way whatsoever, affect any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, other DIP Loan Document, or right or remedy of the DIP Lender under the DIP Loan Documents. Notwithstanding any such stay, modification, reversal, or vacation, all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies of the DIP Lender under the DIP Loan Documents made, available, and/or in effect prior to the effective date of such stay, modification, reversal, or vacation shall be governed in all respects by this Final DIP Order as originally entered by the Court. The DIP Lender is entitled to and shall have

in all cases the protections of Bankruptcy Code section 364(e) with respect to all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies under the DIP Loan Documents and shall be so protected notwithstanding any stay, modification, reversal, or vacation of this Final DIP Order.

22. This Final DIP Order shall survive entry of any order, in this Court or any other court of competent jurisdiction, (a) confirming a chapter 11 plan (and, to the extent not satisfied in full in cash on the effective date of such plan, the DIP Obligations shall not be discharged under or by entry of such order, notwithstanding Bankruptcy Code section 1141(d)), (b) appointing an examiner or chapter 11 trustee, (c) converting the Case to a case under Bankruptcy Code chapter 7, or (d) dismissing the Case. This Final DIP Order, together with all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies of the DIP Lender under the DIP Loan Documents shall continue in full force and effect, notwithstanding the entry of any such order, until full and indefeasible payment of all DIP Obligations.

23. In the event of any inconsistency between any other DIP Loan Document and this Final DIP Order, the terms of this Final DIP Order shall govern.

24. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9014, or anything else in the Bankruptcy Rules or any other applicable rule of procedure, this Final DIP Order shall be valid, take full effect, and be enforceable immediately upon entry hereof. There shall be no stay of execution or effectiveness of this Final DIP Order, all of which are hereby waived for cause shown.

25. The Court has and shall retain jurisdiction to enforce this Final DIP Order, including to hear any motion or application by the Debtor or the DIP Lender related hereto or to any other DIP Loan Document, according to its terms.

Dated: May 16, 2022

/s/ Henry A. Callaway
HENRY A. CALLAWAY
CHIEF U.S. BANKRUPTCY JUDGE

Case 22-10260 Doc 197-1 Filed 05/26/22 Entered 05/26/22 15:25:29 Desc Main Document Page 13 of 15

Case 22-10260 Doc 97 Filed 05/16/22 Entered 05/16/22 16:56:29 Desc Supplement Order resized and read into order to be put into Bankruptcy Noticin Page 13 of 15

Exhibit A

Budget

# THOMASBORO - PROJECTED CASH FLOWS

**Project Start Date** May-22

| | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Bank Balance** | 100 | - | 56,364 | - | - | - | 53,775 | - | - | 2,881,285 | 1,527,286 | 77,277 | - | - | - | 1,952,986 | 1,903,298 | |
| **Inflows** | | | | | | | | | | | | | | | | | | |
| Finished Lots Sales (Developed) | - | - | 232,048 | 393,973 | 633,734 | 237,455 | 1,699,607 | - | 275,624 | 279,873 | 1,985,002 | 2,469,533 | 2,936,215 | 1,650,275 | - | - | - | 31,740,000 |
| Sale of Lots (Undeveloped) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,000,000 |
| Financing Draws | 13,272,244 | 277,777 | 277,777 | 277,778 | 277,778 | - | - | 5,000,000 | - | - | - | - | 12,065,000 | 8,500,000 | 11,175,000 | - | - | 25,272,822 |
| EMD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,150,822 |
| **Total Inflows** | 13,272,244 | 277,777 | 509,825 | 671,751 | 911,512 | 1,927,778 | 1,977,385 | 5,277,778 | 277,778 | 277,778 | 1,985,002 | 2,469,533 | 15,001,215 | 10,150,275 | 11,175,000 | - | - | 66,162,822 |
| **Outflows** | | | | | | | | | | | | | | | | | | |
| *LENNAR - NORTH 156 LOTS* | | | | | | | | | | | | | | | | | | |
| Construction | - | (191,413) | (160,991) | (278,837) | (185,093) | (585,263) | (801,180) | (558,370) | (741,224) | (741,238) | (766,008) | (1,104,863) | (1,084,555) | (77,000) | (77,000) | - | - | (7,353,000) |
| Land Cost | (6,634,108) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (6,634,108) |
| Development Tasks | (338,344) | (30,000) | (95,000) | (15,000) | (95,969) | (68,979) | (68,979) | (68,979) | (68,979) | (68,979) | (166,156) | (377,242) | (432,073) | (67,978) | (88,097) | (29,689) | (340,179) | (2,420,000) |
| *MUNGO - SOUTH 149 - 42' LOTS* | | | | | | | | | | | | | | | | | | |
| Construction | - | - | - | (178,364) | (323,700) | (566,000) | (456,000) | (907,534) | (351,550) | (422,000) | (388,605) | (248,743) | (483,268) | (434,575) | (270,234) | - | - | (5,030,000) |
| Land Cost | (3,420,629) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (3,420,629) |
| Development Tasks | (249,000) | - | (12,000) | (12,000) | (12,000) | (12,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (165,320) | (420,500) | (168,543) | (5,000) | (188,476) | (1,616,839) |
| *CAVINESS & CATES - SOUTH 100 - 52' LOTS* | | | | | | | | | | | | | | | | | | |
| Construction | - | - | (190,248) | (187,550) | (229,750) | (559,565) | (578,000) | (734,610) | (292,610) | (368,570) | (614,511) | (508,310) | (351,000) | (351,841) | (10,000) | - | (4,976,000) | |
| Land Cost | (2,295,263) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (2,295,263) |
| Development Tasks | (210,000) | - | - | - | (65,000) | (65,000) | (65,000) | (65,000) | (65,000) | (65,000) | (65,000) | (125,000) | (420,000) | (298,381) | (15,000) | (15,000) | (142,937) | (1,681,768) |
| *FINANCING COSTS* | | | | | | | | | | | | | | | | | | |
| Bankruptcy Administrator Fees | - | - | (107,950) | - | - | (17,196) | - | - | (50,413) | - | - | (43,375) | - | - | (220,968) | - | (73,776) | (513,678) |
| Bankruptcy Counsel Fees | (95,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (95,000) |
| Real Estate Counsel Fees | (30,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (30,000) |
| Loan/Interest Payments | - | - | - | - | - | - | - | - | - | - | - | - | (12,065,000) | (8,500,000) | (8,372,172) | - | - | (28,937,172) |
| **Total Outflows** | (13,272,344) | (221,413) | (566,189) | (671,751) | (911,512) | (1,874,003) | (2,031,159) | (2,396,493) | (1,631,777) | (1,727,787) | (2,062,279) | (2,469,533) | (15,001,215) | (10,150,275) | (9,222,014) | (49,689) | (745,368) | (65,004,032) |
| **Net Cash Flows** | (100) | 56,364 | (56,364) | - | - | 53,775 | (53,775) | 2,881,285 | (1,353,999) | (1,450,009) | (77,277) | - | - | - | 1,952,986 | (49,689) | (745,368) | |
| **Ending Bank Balance** | - | 56,364 | - | - | - | 53,775 | - | 2,881,285 | 1,527,286 | 77,277 | - | - | - | - | 1,952,986 | 1,903,298 | 1,157,930 | |
| **Debt / Loan Balance** | | | | | | | | | | | | | | | | | | |
| Proceeds from Financing | 13,272,244 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $26,000,000 |
| Accrued Interest | - | 204,614 | 211,346 | 220,678 | 233,850 | 237,455 | 267,318 | 271,439 | 275,624 | 279,873 | 314,790 | 357,715 | 408,496 | 254,234 | 127,111 | - | - | 18.50% |
| Payments on Debt | - | - | - | - | - | - | - | - | - | - | - | - | (12,065,000) | (8,500,000) | (8,372,172) | - | - | |
| Outstanding Balance (totals) | 13,272,244 | 13,476,858 | 13,920,251 | 14,534,901 | 15,402,485 | 15,639,940 | 17,606,865 | 17,878,304 | 18,153,928 | 18,433,801 | 20,733,593 | 23,560,841 | 14,840,552 | 8,245,061 | (0) | (0) | (0) | (0) |

Case 22-10260 Doc 97 Filed 05/16/22 Entered 05/16/22 15:56:29 Desc
Document Page 15 of 15

Case 22-10260 Doc 97-1 Filed 05/16/22 Entered 05/16/22 15:56:29 Desc
Supplement Order resized and reattached in order to print via Bankruptcy Noticin Page 15 of 15